IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARLOS DEANS,                          :    CIVIL ACTION
                                       :    NO. 11-7125
          Plaintiff,                   :
                                       :
     v.                                :
                                       :
THE KENNEDY HOUSE, INC., et al.,       :
                                       :
          Defendants.                  :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          February 25, 2014

Table of Contents

I. Background..................................................2
  A.  Childcare Issues.........................................4
  B. Medical Absence and Termination .........................10
  C. Grievance Procedure .....................................16
II. Procedural History........................................20
III. Legal Standard...........................................22
IV. Discussion................................................23
  A. Defendants' Motions for Summary Judgment..................24
    1. Gender and Race Discrimination Claims ..................24
        a. Claims Against the Kennedy House Defendants .........25
        b. Claims Against the Union Defendants .................34
    2. Hostile Work Environment ...............................40
    3. Retaliation and Retaliatory Discharge ..................42
        a. Claims Against the Kennedy House Defendants .........43
        b. Claims Against the Union Defendants .................46
    4. Hybrid § 301/Fair Representation Claim ..................47
    5. ERISA Claim ............................................54
  B. Plaintiff's Motion for Summary Judgment ..................56
V. Conclusion.................................................56

Plaintiff Carlos Deans brings this action[1] against his former employer, Defendant Kennedy House, Inc., and his union, Service Employees International Union, Local 32BJ, as well as individual defendants Thomas Smith, Robert McMillan, Vaughn Johnson, and James Giblin (collectively, "Defendants"). After conducting discovery, the parties filed cross motions for summary judgment. For the reasons that follow, the Court will grant Defendants' motions in their entirety and deny Plaintiff's motion.

## I.  BACKGROUND

Plaintiff Carlos Deans is an individual who was employed by the Kennedy House from August 21, 2007, until approximately February 10, 2011, to perform general housekeeping functions. Pl.'s Resp. Kennedy House Statement Facts ¶¶ 1-2, 91, ECF No. 90. Defendant Kennedy House, Inc., is a corporation that operates a residential building in the City of Philadelphia (the "Kennedy House"). Kennedy House Statement Facts ¶ 1, ECF No. 73-2. Defendant Local 32BJ is a local union affiliated with the Service Employees International Union (the "Union"). The Union is the exclusive bargaining agent for the employees in the

---

[1]     Deans brings this action pro se. On August 6, 2012, Eric G. Marttila, Esq., entered an appearance on behalf of Deans. ECF No. 35. Approximately three weeks later, on August 31, 2012, counsel withdrew his appearance at Deans's request. ECF No. 37. Deans proceeded pro se for the remainder of the litigation.

bargaining unit at the Kennedy House. Union Statement Facts ¶¶ 22, 23. At all relevant times, Deans was a member of the bargaining unit. Decl. Thomas Smith ¶¶ 1-4, ECF No. 77. The Union and the Kennedy House have entered into a collective bargaining agreement ("CBA"). Because Deans was a member of the bargaining unit, his wages and the terms of his employment were covered by the CBA. Among other things, the CBA barred the Kennedy House from discharging or disciplining an employee "except for just cause." Pl. Mot. Summ. J., Ex. GG, CBA 4, ECF No. 71-49. The CBA also provided for a "progressive discipline schedule"[2] and established a process for resolving disputes or grievances between the employer and the Union or the employee. Id.

This case arises from several contentious issues Deans had with the Kennedy House and the Union during the last year of his employment. Those issues can be roughly grouped into two categories: (1) issues regarding the Kennedy House's responses to tardiness and attendance problems arising from Deans's childcare responsibilities; and (2) issues regarding Deans's medical absence from work in January 2011 and the subsequent termination of his employment.

---

[2]     The steps in the progressive discipline schedule are: (1) verbal warning by immediate supervisor; (2) written warning by manager; (3) written warning (3 day suspension) by manager; and (4) termination by manager. CBA 4.

A. Childcare Issues

The issues arising from Deans's childcare responsibilities began in the summer of 2010. Throughout 2010, Deans would often leave work at around 3:00 in the afternoon, apparently to take care of his children.[3] Kennedy House Mot. Summ. J., Ex. A, Giblin Aff. ¶ 17, ECF No. 73-4; Pl.'s Resp. Kennedy House Statement Facts ¶¶ 43, 45. According to Kennedy House General Manager James Giblin, that departure time was improper, as Deans's official hours were from 7:30 a.m. until 3:30 p.m., Monday through Friday.[4] Kennedy House Statement Facts ¶¶ 3, 43-45. Deans disagrees, claiming that Giblin had given him permission to leave at 3:00 p.m., and that he had been doing so since 2009 without suffering any disciplinary action. Pl.'s Resp. Kennedy House Statement Facts ¶¶ 43, 45. Giblin acknowledges that Deans had asked for and received permission to

---

[3]     Both parties seem to suggest that the 3:00 p.m. leave time was related to Deans's childcare responsibilities, but neither party explains the nature of those responsibilities.

[4]     The record also suggests that Deans worked at least some weekend shifts. According to Giblin, the housekeeper with the least seniority is responsible for weekend shifts, and Deans occupied that role until December 2010, when a new housekeeper was hired. Giblin Aff. ¶ 37. At that point, Giblin says that Deans was removed from weekend shifts, which Giblin "believed was helpful to him because he wanted to spend time with his children on the weekends." Id. Deans disagrees that new hires are responsible for weekend shifts, and he suggests that Giblin's adjustment of his schedule is evidence of his "impermissible reliance on sex and race based stereotypes." Pl.'s Resp. Kennedy House Statement Facts ¶¶ 53; 78.

leave at 3:00 p.m. on several occasions, but contends that Deans did not have authorization to leave early on a regular basis until September 2010. Kennedy House Statement Facts ¶¶ 43-45.

On June 25, 2010, Deans was summoned for a disciplinary meeting with Giblin and Vaughn Johnson, Deans's immediate supervisor (the "First Meeting"). Pl.'s Resp. Kennedy House Statement Facts ¶ 46; Pl. Mot. Summ. J., Ex. I, First Meeting Notes, ECF No. 71-49. The notes from that meeting indicate that its purpose was to address "the many times that [Deans] had called out due to some problem finding child care for his children." First Meeting Notes. At the meeting, Giblin told Deans that frequently calling out of work "shows disrespect for his co-workers and the Kennedy House," and that Deans had to "set up contingency plans to attend to his child care needs that would not prevent him from meeting his workplace obligations." Id. Giblin also issued Deans a verbal warning – the first step in the CBA's progressive discipline process – and he explained that Deans "would be treated more harshly in the future if he does not correct this problem now." Id. The meeting notes indicate that Deans "promised he would find some way to handle his home problem without it affecting his work responsibilities." Id. It also appears from the notes that Giblin briefly addressed some concerns about Deans's work performance, namely that he took too many breaks during the day.

Id. Deans signed the meeting notes, certifying that he agreed with their contents, but later submitted a letter disputing the basis for the discipline. Id.; see also Pl. Mot. Summ. J., Ex. J, Objection Letter, ECF No. 71-49. In particular, Deans said that there was no tally of the number of times he had called out, and that the claim that he took excessive breaks was "untrue and without merit." Objection Letter.

In addition to the statements documented in the meeting notes, both Giblin and Deans agree that, during the June 25th meeting, Giblin asked Deans whether he was the "breadwinner" in his household. Giblin Aff. ¶ 22; Mem. Support Pl. Mot. Summ. J. 5, ECF No. 71-1. Deans, who is African-American, attributes the comment to race and gender-based discriminatory animus, and he further claims that Giblin "urged [him] to resign by stating '[t]his isn't a good fit for you' . . . and encouraging [him to] take on more traditionally feminine work roles," such as "something in customer service."[5] Mem. Support Pl. Mot. Summ. J. 5. Giblin, on the other hand, says that he asked Deans if he was the breadwinner to emphasize that, "if he was the breadwinner, then his responsibilities to his employer were important."

---

[5]    It is unclear whether Deans alleges that Giblin made the resignation comment during the First Meeting, or during a second disciplinary meeting held a month later. His filing with the Equal Employment Opportunity Commission suggests that Giblin made the comment during the second meeting. See Pl. Mot. Summ. J., Ex. A, EEOC Intake Questionnaire 3, ECF No. 71-49.

6

Giblin Aff. ¶ 22. Giblin disputes that his comment reflected any discriminatory intent, and he emphasizes that he never made any comments "referencing or relating to [Deans's] race and/or gender."[6] Id. ¶ 24.

About a month later, on July 21, 2010, Deans was again called in for a disciplinary meeting, this time with Giblin, Johnson, and Union Shop Steward Robert McMillan (the "Second Meeting"). Pl. Mot. Summ. J., Ex. K, Second Meeting Notes, ECF No. 71-49. Prior to the meeting, Giblin had reviewed Deans's time cards for the previous several months and concluded that Deans had been late eleven times in seventy-three days, for a total tardiness of four hours and fifty-four minutes. Id.  At the meeting, Giblin explained that Deans "continues to come in late, especially on the weekends, but does not always call to inform his relief," and he reiterated that Deans "has to be at work when he is scheduled." Id. Giblin also noted several work performance issues. Id. Due to those alleged problems, Giblin issued Deans a written warning, which is the second step in the CBA's progressive discipline process. Id.; see also CBA 4.

---

[6]     In addition to the "breadwinner" comment, Deans alleges that, in early May 2010, Giblin told him: "I'm a family man, too, and I never let my children get in the way of my work. My wife stayed at home with the kids." EEOC Intake Questionnaire 3.

Following the Second Meeting, Deans filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") on August 10, 2010 (the "First EEOC Charge"). Pl. Mot. Summ. J., Ex. B, EEOC Charge 2-3, ECF No. 71-49. The charge alleged claims of gender discrimination and retaliation, and it asserted that Deans was "being disciplined for not fitting into a traditional male role model as breadwinner, having my spouse be responsible for childcare issues." Id.; see also Pl. Mot. Summ. J., Ex. A, EEOC Intake Questionnaire 3-6, ECF No. 71-49.

On September 7, 2010, Deans received a memorandum from Giblin regarding additional tardiness issues. Pl. Mot. Summ. J., Ex. M, Sept. 7 Tardiness Memo, ECF No. 71-49. The memorandum noted that Deans had been four minutes late to work on September 1, 2010, and five minutes late to work the following day. Id. It further informed Deans that he would be docked fifteen minutes of pay and would be subject to further discipline if he continued to arrive late to work. Id. Deans admits that he was late to work as described, but claims that he was being singled out for discipline for minor offenses in retaliation for his EEOC charge. Pl.'s Resp. Kennedy House Statement Facts ¶ 68. In response, the Kennedy House points to several similar memoranda

issued to other tardy employees.[7] See Kennedy House Mot. Summ.

J., Exs. I, J, M, and N, ECF Nos. 73-12, 73-13, 73-16, 73-17.

About a week later, on September 15, 2010, Deans met with

Giblin to discuss changes to his work schedule. Pl. Mot. Summ.

J., Ex. N, Work Schedule Memo, Sept. 15, 2010, ECF No. 71-49.

According to the memorandum documenting the meeting, Giblin

offered Deans two schedule options:

> Option 1: Change your shift to: 7 a.m. until 3 p.m.
> Wednesday, Thursday & Friday each week.
>
> Option 2: Maintain your shift: 7:30 a.m. until 3 p.m.
> Wednesday, Thursday & Friday each week. This option
> will mean you will work a 7 ½ hour shift on those 3
> days which results in a 38 ½ hour shift per week.

Id. Deans selected Option 2, which he contends was just a

continuation of the adjusted schedule that had been authorized

---

[7]      Those memoranda show that: (1) employee Patrice
McGinty was late to work on three consecutive days and was
docked forty-five minutes of pay (Ex. I), and that she was
subsequently late by ten minutes and docked fifteen minutes of
pay (Ex. N); (2) employee Alan Berry was eleven minutes late to
work and was docked fifteen minutes of pay (Ex. J); and (3)
employee William Curran was late for work or left early by 113
minutes and was docked two hours of pay (Ex. M). Deans claims
that those documents have been improperly altered because the
documents' metadata indicates that they were created on November
1, 2010 – after the dates the disciplinary actions allegedly
took place. Mem. Support Pl. Mot. Summ. J. 11; Pl. Mot. Summ J.
¶ 32. In response, Kennedy House explains that the "creation
date" reflected in the metadata is November 1, 2010, "because
that is the last time the document was saved." Kennedy House
Resp. Pl.'s Statement Facts ¶ 32, ECF No. 88. Saving the
document altered the "creation date" because of a Microsoft Word
product upgrade, which apparently converted the file from a .doc
to a .docx. Id.

by Giblin since 2009.[8] Id.; Pl.'s Resp. Kennedy House Statement Facts ¶ 70. The Kennedy House, on the other hand, contends that the meeting with Giblin marked the beginning of Deans's time working on an adjusted schedule. Kennedy House Statement Facts ¶ 45.

In November 2010, Deans filed a second discrimination charge with the EEOC and the PHRC (the "Second EEOC Charge"). The charge added a claim of race discrimination, contending that similarly situated white employees were not disciplined for time and attendance problems related to childcare issues. EEOC Charge 1. The charge also claimed that the docking of his pay and the schedule change in September 2010 were evidence of the Kennedy House's efforts to retaliate against Deans for his initial EEOC complaint. Id.

B. Medical Absence and Termination

Following the September 2010 incidents described above concerning repeated lateness and schedule issues, Deans does not appear to have had any further discipline problems until January

---

[8]     Deans contends that employee Patrice McGinty also worked on an adjusted schedule, and that she was allowed to maintain her adjusted schedule without any formal agreement or other "disparaging treatment." Pl.'s Resp. Kennedy House Statement Facts ¶ 70. The Kennedy House acknowledges that McGinty's schedule was modified to allow her to leave at 10:00 p.m., rather than 11:00 p.m., due to transportation concerns, but it says that Deans "is the only employee whose schedule has been modified since Giblin became the General Manager." Kennedy House Statement Facts ¶¶ 16, 71.

2011, when he was absent from work due to a back injury and was eventually deemed by the Kennedy House to have abandoned his position. Those events transpired as follows.

The last day that Deans reported to work was January 11, 2011. Kennedy House Statement Facts ¶ 80; Pl.'s Resp. Kennedy House Statement Facts ¶ 80. According to a letter he later submitted to the EEOC, Deans sprained his back sometime that day, and so took leave from work. Pl. Mot. Summ. J., Ex. C, EEOC Letter, May 27, 2011, at 2, ECF No. 71-49. Two days later, on January 13, 2011, he was admitted to the emergency room at Mercy Hospital in Philadelphia and diagnosed with muscles spasms and back strain. Pl. Mot. Summ. J., Ex. O, Discharge Paperwork, ECF No. 71-49. His hospital discharge paperwork instructed him to follow up with a primary care physician in one to two days, and with a specialist in three to four days. Id. It further told him that, with proper rest, the pain would likely go away in five to seven days. Id.

On or around January 20, 2011, Deans faxed Kennedy House his hospital discharge paperwork. Pl.'s Resp. Kennedy House Statement Facts ¶ 81. Prior to that fax, Deans had not communicated with the human resources department at the Kennedy House or with Giblin regarding his absence from work. He had, however, communicated regularly with Vaughn Johnson, his immediate supervisor. According to cell phone records Deans

11

provides, he and Johnson exchanged thirteen calls and text messages between January 11 and January 28. Pl. Mot. Summ. J., Ex. P, Cell Phone Records, ECF No. 71-49. In fact, following Deans's termination, the Unemployment Compensation Board of Review found that Deans "kept in constant contact with his supervisor," communicating with him every day during that period except for on Saturdays, Sundays, and the Martin Luther King Day holiday. Pl. Mot. Summ. J., Ex. EE, Unemployment Compensation Review Board Decision 2, ECF No. 71-49.[9] Deans says that, based on his health and the winter weather conditions, he and Johnson decided that Deans should return to work on January 31, 2011. EEOC Letter 3.

But before that date arrived, Deans received a letter from Giblin, dated January 24, 2011, informing him that he had used all of his personal days, sick time, and vacation, and thus was no longer on the Kennedy House payroll. Pl. Mot. Summ. J., Ex. U, Letter re: Sick Time, Jan. 24, 2011, ECF No. 71-49. The letter acknowledged receiving the information regarding his emergency room visit, but noted that "[t]he report did not

---

[9]     After the termination of his employment, Deans applied for and was denied unemployment benefits. He appealed the denial to the Unemployment Compensation Review Board, which reversed and awarded him benefits. Unemployment Compensation Review Board Decision 3. The Review Board based that decision on its finding that Deans had not voluntarily abandoned his position, but instead had been discharged by the Kennedy House. Id. at 2-3.

include a date when you would be able to return to work." Id. It
further stated: "Please understand that you will receive no
further pay from the Kennedy House, Inc. until your [sic] do
return to work. Please bring a doctor's note with you that will
state you are fit for duty, when you do return." Id. The letter
concluded by requesting that Deans contact the Kennedy House as
soon as possible to inform them of his intentions. Id.

Deans claims that he received that letter on January 30,
2011, and then promptly responded by letter dated February 1,
2011. EEOC Letter 3; see also Pl. Mot. Summ. J., Ex. V, Letter
re: Removal from Payroll, Feb. 1, 2011, ECF No. 71-49. In his
response, he informed Giblin that he would work to secure the
requested documentation, and stated:

> [i]f the determination letter of my being
> fit for duty by my physician is the
> prerequisite for my return then I should be
> able to obtain that at least by my next
> appointment on 3/8/11. If there are any
> other options that could be undertaken,
> please let me know.

Id. Giblin responded ten days later, on February 10, 2011, with
a letter titled "Non-Compliance with Work Policies – Job
Abandonment." Pl. Mot. Summ. J., Ex. W, Letter re: Job
Abandonment, Feb. 10, 2011, at 1, ECF No. 71-49. The letter
acknowledged receipt of Deans's response letter of January 30,
2011, but stated that it was "unacceptable" for Deans to wait
until March 8 to provide a note from his doctor. Id. Giblin

13

further described several policies in the Kennedy House's Employee Handbook that Deans was allegedly violating, including an attendance policy providing that, if an employee is "absent from work for three (3) work days or longer without calling in and speaking with [his] supervisor," that employee "will be regarded as having voluntarily quit [his] employment."[10] Id. Giblin also referenced several policies regarding the documentation needed to verify sick leave and temporary medical disabilities. Id. at 2. Finally, Giblin stated: "Having had no specific communication from you to explain what is causing you to be away from work for this lengthy period, we have no alternative but to consider that you have voluntarily abandoned your position at the Kennedy House, Inc." Id.

Deans responded to Giblin's letter the next day, asking him to "[p]lease reconsider" his assessment of the situation. Pl. Mot. Summ. J., Ex. X, Letter re: Abandonment Letter, Feb. 11, 2011, at 1, ECF No. 71-49. Deans described his communications with Johnson, noting that he had "repeatedly asked Mr. Johnson to keep [him] informed as to any need for documentation concerning [his] condition," and that he had promptly faxed the emergency room discharge information as soon

---

[10]    Deans says that he never received a copy of the Employee Handbook, and that he was unaware of the policies that he was allegedly violating. Pl.'s Resp. Kennedy House Statement Facts ¶ 19.

as Johnson indicated it was necessary. Id. He also noted that Giblin "never made any mention of [him] violating any policies" during their previous communications. Id. He concluded by asking Giblin to please reinstate him to his previous position.

Deans was not reinstated, however, and, on February 24, 2011, he received a letter informing him that, as of February 28, 2011, he would no longer be covered by the Aetna health insurance plan provided under the CBA. Pl. Mot. Summ. J., Ex. AA, Letter re: Aetna Insurance, Feb. 24, 2011, ECF No. 71-49. The letter further explained that he could continue his benefits under his previous plan by electing continuation coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). Id. Deans contends that his benefits were actually terminated earlier, on January 22, 2011, before his employment was officially terminated. EEOC Letter at 3.[11]

---

[11] In support of that contention, he has submitted three documents: (1) a bill for dental services performed on February 14, 2011, which notes that the "charges [were] incurred after the member's termination date"; (2) a screen shot of his dental insurer's webpage showing no coverage as of January 22, 2011; and (3) another dental bill stating that the insurance company denied claims on February 1 and February 14 because "your policy was terminated as of 01/22/11." Pl. Mot. Summ. J., Exs. R, S, and T, Benefits Documents, ECF No. 71-49. Each of those documents relates to his dental benefits, however, which were provided by Guardian Life Insurance Company of America. Kennedy House Statement Facts ¶ 4. Deans has no documentation other than the COBRA notice regarding when Aetna terminated health benefits. Kennedy House Mot. Summ. J., Ex. E, Deans Dep. 188:20-189:1, ECF No. 73-8.

C. Grievance Procedure

After the termination of his employment, Deans filed a grievance against his employer pursuant to the grievance procedure established in the CBA. According to the CBA, that procedure involves three steps. At Step 1, the aggrieved employee, the Union Shop Steward, and the employee's supervisor meet to discuss the grievance. CBA 4. If no satisfactory agreement is reached, the parties progress to Step 2, at which point the employee, the Union Member Advocate, the Union Shop Steward, and the employer must make a "concerted effort . . . to resolve the grievance." Id. at 4-5. Finally, the matter is referred to a "Third Step Grievance Committee," which consists of four members – two selected by the employer, and two selected by the Union. Id. at 5. If the four-member committee cannot agree on a resolution, then the Union's attorney reviews the grievance and decides whether to file the case for arbitration. Id.

Deans filed his grievance with the Union on approximately February 17, 2011. Pl. Mot. Summ. J., Ex. Y, Report of Grievance, ECF No. 71-49. Union Shop Steward Robert McMillan did not hold a Step 1 meeting, however, allowing the grievance to proceed directly to a Step 2 meeting. Union Statement Facts ¶ 114. The Union claims that, although they are ostensibly required under the CBA, Step 1 meetings are not always held in

16

practice. Id. ¶ 38. Rather, the Union generally holds Step 1
meetings "when reasonable and when it would be helpful in
resolving the matter." Id. According to the Union, Step 1
meetings rarely take place "if a worker is not at the work site
at the time of termination." Id.

On March 28, 2011, Thomas Smith – the union
representative for the Kennedy House employees – informed Deans
that a Step 2 meeting was scheduled for the following day,
giving him around twenty hours of advance notice. Id. ¶¶ 24,
116-117; EEOC Letter 4. The meeting was attended by Deans,
Smith, McMillan, Giblin, and Johnson (Deans's immediate
supervisor). Union Statement Facts ¶ 117; EEOC Letter 5. The
parties dispute the substance and strength of the arguments
presented at the hearing, but they agree on the result: the
grievance remained unresolved. Union Statement Facts ¶¶ 117-121;
Pl.'s Resp. Union Statement Facts ¶¶ 118-121; EEOC Letter 6.
Deans's grievance therefore proceeded to the Step 3 grievance
committee.

On April 5, 2011, Smith sent Deans a letter informing him
of his hearing date, which erroneously but unimportantly
identified the hearing as a "first Step Grievance hearing." Pl.
Mot. Summ. J., Ex. BB, Hearing Notice Letter, ECF No. 71-49. The
hearing, which was in fact a Step 3 hearing, occurred on April
13, 2011. Deans's grievance committee consisted of Union

Representatives Toya Hendricks and Joseph Miller, as well as two employees of the Kennedy House – Lewis Rigler and Lynn Wagner. Id. ¶ 126; Kennedy House Statement Facts ¶ 104. In addition to the committee members, the hearing was attended by Deans, Smith, McMillan, Giblin, and Johnson. EEOC Letter 7; Union Statement Facts ¶¶ 126-135. During the hearing, both Deans and Giblin testified, and Miller asked several questions. Union Statement Facts ¶ 130. The committee members were also provided with copies of numerous documents, including: (1) the January 24 and February 10 letters Giblin sent to Deans; (2) Deans's emergency room discharge summary; (3) the text messages Deans sent to Johnson during his absence; and (4) the February 1 letter Deans sent to Giblin. Id. ¶ 132; Pl.'s Resp. Union Statement Facts ¶ 132. Smith (Deans's union representative) chose not to argue to the committee that Deans's termination was motivated by race or gender, as he did not believe that there was credible evidence to support that contention. Union Statement Facts ¶ 134. Following deliberations, the committee unanimously voted in favor of upholding the termination of Deans's employment. Id. ¶ 136.

On May 2, 2011, Smith called Deans and told him that his termination had been upheld. Id. ¶ 140; EEOC Letter 8. Not satisfied that the decision was final, Deans sent a letter requesting a written copy of the decision of the panel and the

18

reason for the decision. EEOC Letter 8; Pl. Mot. Summ. J., Ex. CC, Letter to Union re: Committee Decision, May 9, 2011, ECF No. 71-49. On May 15, 2011, he received a copy of the official Grievance Committee Report, which stated that the "[t]ermination stands." Pl. Mot. Summ. J., Ex. DD, Grievance Committee Report, ECF No. 71-49; EEOC Letter 8. The Union declined to take his grievance to arbitration.

Following that decision, Deans sent a letter to the EEOC on May 27, 2011, which he termed "an amendment to the charges relating to sex/race discrimination" that he had previously filed (the "EEOC Letter"). EEOC Letter 1. The EEOC Letter described the events that had transpired, and, at the conclusion of the letter, Deans wrote:

> I now request to amend these charges to reflect the union SEIU Local 32BJ supporting and thru [sic] agreement enjoining itself with the employer in the violation of my Title VII rights and in retaliation for filing with the EEOC.

Id. at 8. He did not, however, file a formal charge or amendment adding claims against the Union, nor did the EEOC treat the letter as a formal charge. Union Statement Facts ¶¶ 148-150; Decl. Katchen Locke, Ex. B, EEOC FOIA Request, ECF No. 76-4. On September 13, 2011, the EEOC issued Deans a "Right to Sue" letter for each of his two formal charges, Pl. Mot. Summ. J., Ex. E, Right to Sue Letters, Sept. 13, 2011, ECF No. 71-49, and

a week later the PHRC administratively closed his case. Pl. Mot. Summ. J., Ex. D, PHRC Letter, Sept. 22, 2011, ECF No. 71-49.

## II.   PROCEDURAL HISTORY

Deans initiated this action on November 15, 2011, by filing an application to proceed in forma pauperis ("IFP"). ECF No. 1. Upon being granted IFP status, Deans filed a complaint against the Kennedy House, James Giblin, and Vaughn Johnson (the "Kennedy House Defendants"), as well as the Union, Thomas Smith, and Robert McMillan (the "Union Defendants"). ECF No. 3. The complaint pleads the following nine counts: (1) gender and race discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; (2) race discrimination, in violation of 42 U.S.C. § 1981; (3) hostile work environment, in violation of Title VII and § 1981; (4) retaliation, in violation of Title VII and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951; (5) breach of contract; (6) breach of the duty of fair representation; (7) gender and race discrimination, in violation of the PHRA; (8) violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.; and (9) retaliatory discharge, in violation of Title VII and the PHRA.

On March 23, 2012, the Kennedy House, James Giblin, and Robert McMillan filed motions for partial dismissal of the complaint. ECF Nos. 5, 6, and 7. Shortly thereafter, the Union

Defendants moved to dismiss all allegations against them pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 12. After a hearing on those motions, the Court issued an order dismissing all Title VII claims against individual defendants Giblin, McMillan, Johnson, and Smith, as well as any claims against them arising under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Order, June 29, 2012, at 1, ECF No. 34. The Court also dismissed Deans's claims for punitive damages. Id. at 1-2. Finally, the Court allowed Deans to pursue a hybrid § 301/fair representation claim[12] against defendants Kennedy House and the Union, but only to the extent that the claim relates to grievances that were the subject of the Step 3 grievance hearing held on April 13, 2011. Id. at 2.

The parties proceeded to discovery and, on May 2, 2013, Deans filed a motion for summary judgment. ECF No. 71. The Kennedy House Defendants and the Union Defendants each filed a cross-motion for summary judgment on May 6, 2013. ECF Nos. 73, 74. The parties filed appropriate responses to each motion, and

---

[12]     As discussed in more depth herein, an employee's suit against his employer for breach of a collective bargaining agreement "comprises two causes of action" – a suit against the employer for breach of the agreement based upon § 301 of the LMRA, and a suit against the union "for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act." DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164 (1983).

the Union Defendants were granted leave to file a reply brief. The motions are now ripe for disposition.

### III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who

must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

The guidelines governing summary judgment are identical when addressing cross-motions for summary judgment. See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). When confronted with cross-motions for summary judgment "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Schlegel v. Life Ins. Co. of N. Am., 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (1998)).

## IV.  DISCUSSION

Deans brings nine different counts against Defendants, and each of those counts survived the motions to dismiss as to at least some Defendants. Those counts can be grouped as follows: (1) gender and race discrimination claims brought pursuant to Title VII, § 1981, and the PHRA; (2) hostile work environment claims; (3) retaliation and retaliatory discharge claims; (4) the hybrid § 301/fair representation claim; and (5) the ERISA claim.

Deans contends that there is no genuine dispute as to any fact material to those claims, and that he "is entitled to

judgment as a matter of law on all counts." Mem. Support Pl. Mot. Summ. J. 1. Defendants also contend, but for different reasons, that there is no genuine dispute of material fact and that judgment can be entered in their favor. More specifically, Defendants argue that there is no evidence of any discriminatory animus on the part of the employer or the Union, that the Kennedy House acted properly in terminating Deans's employment, and that the Union did not breach its duty of fair representation. The Union Defendants further contend that Deans's hybrid § 301/fair representation claim is time-barred, and that he has not exhausted his administrative remedies as to the Title VII and PHRA claims against the Union Defendants. Finally, the Kennedy House Defendants say that Deans has not offered evidence to support his ERISA claim.

In accordance with the summary judgment standard, cross motions for summary judgment must be addressed separately. For the reasons expressed below, the Court will deny Plaintiff's motion for summary judgment and grant Defendants' cross-motions in full.

A. Defendants' Motions for Summary Judgment

1. Gender and Race Discrimination Claims Under Title VII, § 1981, and the PHRA

Deans's primary assertion is that his Kennedy House supervisors and his Union representatives discriminated against

him because his role as caregiver to his children did not comport with their image of the "traditional" black male. EEOC Charge 3. He claims that the disciplinary actions taken against him, the termination of his employment, and the Union's allegedly shoddy handling of his grievance were all motivated by that discriminatory animus, in violation of Title VII, 42 U.S.C. § 1981, and the PHRA. The Kennedy House and the Union disagree, contending that Deans has failed to establish a prima facie case of discrimination as to either Defendant.

a. Claims Against the Kennedy House Defendants

"Title VII and the PHRA both prohibit an employer from engaging in race or gender discrimination against an employee."[13] Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318 (3d Cir. 2000). When, as here, there is no direct evidence of an employer's intent to discriminate on the basis of those protected characteristics, a plaintiff can establish that an action was discriminatory using circumstantial evidence under the familiar McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the burden of production is on the plaintiff to establish a prima facie case

---

[13]      Pennsylvania courts interpret the PHRA in accord with Title VII, Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1084 (3d Cir. 1995), and a claim under 42 U.S.C. § 1981 generally requires the same elements of proof as an employment discrimination claim under Title VII, Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 267 (3d Cir. 2010).

of discrimination. Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013). If the plaintiff succeeds in making out a prima facie case, "then the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action." Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010) (internal quotation marks omitted). If the defendant states such a reason, the presumption of discrimination raised by the prima facie case is rebutted, and plaintiff must show by a preponderance of the evidence that the defendant's explanation is actually a pretext for discrimination. Id.; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993) (explaining that, if a defendant produces a nondiscriminatory reason for its action, plaintiff has an opportunity to show "that the proffered reason was not the true reason for the employment decision and that race was") (citation and internal quotation marks omitted). Throughout this burden-shifting process, "the ultimate burden of proving intentional discrimination always rests with the plaintiff." Anderson, 621 F.3d at 271.

To establish a prima facie case of discrimination under Title VII, a plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of unlawful discrimination. Makky v.

Chertoff, 541 F.3d 205, 214 (3d Cir. 2008). The burden of establishing a prima facie case is not meant to be onerous, as its purpose is simply "to eliminate the most obvious, lawful reasons for the defendant's action." Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999). Nonetheless, that function is important, and a plaintiff must present evidence of each element in order to obtain relief. Tex. Dep't Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981).

At issue here are the third and fourth elements of the prima facie case. The third element, which requires that a plaintiff have suffered an adverse employment action, "stems from the language of Title VII itself" making it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (emphasis in original) (quoting 42 U.S.C. § 2000e-2(a)(1)). The Third Circuit defines "an 'adverse employment action' as an action by an employer that is 'serious and tangible enough to alter'" one of those aspects of a plaintiff's employment. Mieczkowski v. York City Sch. Dist., 414 F. App'x 441, 445 (3d Cir. 2011) (not precedential) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)). Written reprimands and other disciplinary actions can constitute such adverse actions, but only if they "effect a material change in

27

the terms or conditions of [the] employment." <u>Weston v.</u>
<u>Pennsylvania</u>, 251 F.3d 420, 431 (3d Cir. 2001), abrogated on
other grounds as recognized by <u>Burlington N. & Santa Fe Ry. Co.</u>
<u>v. White</u>, 548 U.S. 53 (2006).[14]

 With regard to the fourth element, a plaintiff can
satisfy his burden by presenting evidence upon which a "court
can infer that if the employer's actions remain unexplained, it
is more likely than not that such actions were based on
impermissible reasons." <u>Equal Emp't Opportunity Comm'n v. Metal</u>
<u>Serv. Co.</u>, 892 F.2d 341, 348 (3d Cir. 1990). One way that a
plaintiff can make such a showing is by demonstrating that he
was treated less favorably than a similarly situated employee
outside of the protected class. <u>Jones v. Sch. Dist. of Phila.</u>,
198 F.3d 403, 410-11 (3d Cir. 1999). Such disparate treatment
raises an inference of unlawful discrimination, as "we know from
our experience that more often than not people do not act in a
totally arbitrary manner." <u>Pivirotto</u>, 191 F.3d at 353 (quoting
<u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577 (1978)). Thus,
when similarly situated employees are treated differently, a

---

[14] <u>Burlington Northern</u> abrogated <u>Weston</u>'s application of
that standard to a retaliation claim. <u>See</u> <u>Burlington N. & Santa</u>
<u>Fe Ry. Co.</u>, 548 U.S. at 60-61 (concluding that the
antiretaliation provision in Title VII prohibits different
employer actions than the actions prohibited by the
antidiscrimination provision).

reasonable factfinder can presume that the employer "based his decision on an impermissible consideration such as race." Id.

Deans claims that many of the actions the Kennedy House took against him during his last year of employment were motivated by discriminatory animus. In particular, he identifies as "adverse actions" the verbal warning issued on June 25, 2010, the subsequent written warning issued on July 21, 2010, the docking of his pay due to tardiness, the formal adoption of an adjusted work schedule in September 2010, and the termination of his employment and health benefits. But of those events, only the last one constitutes an "adverse action" for purposes of a Title VII discrimination case. Neither of the disciplinary warnings Deans was issued altered the terms of his employment in any way. Although they were part of a progressive discipline schedule, and thus may have remained in his personnel record and could conceivably in the future form the basis for an adverse action, the two warnings here did not lead to his termination,[15] nor did they otherwise affect the compensation, terms, conditions, or privileges of his employment. See Storey, 390

---

[15]     According to the Kennedy House, Deans's termination was unrelated to the earlier tardiness and attendance issues that formed the basis for the disciplinary warnings, and Deans does not contend that his employment was terminated as part of the progressive disciplinary process. Indeed, one of his allegations against the Kennedy House is that it deviated from the progressive process required by the CBA when it terminated his employment due to job abandonment.

29

F.3d at 764; see also Rivers v. Potter, No. 05-4868, 2007 WL 4440880, at *5 (D.N.J. Dec. 18, 2007) (concluding that a warning letter that remained in a personnel record did not constitute an "adverse action" in a Title VII discrimination case because it "[did] not appear to have resulted in the kind of employment action that would affect [plaintiff's] compensation or other terms, conditions, or privileges of employment"). Until they are acted upon by the employer, they remain simply warnings.

Similarly, the docking of Deans's pay was not "serious and tangible" enough to constitute a material change to the terms of his employment, as there was no permanent reduction in his compensation, and he was only docked for fifteen minutes of work. See Cardenas, 269 F.3d at 263. The formalization of Deans's adjusted work schedule also cannot constitute an "adverse action" because, according to Deans, it did not actually change the terms of his employment at all. Rather, by Deans's own admission, the "adjusted" schedule adopted in September 2010 was simply a continuation of the schedule that Giblin had approved in 2009. See Decl. Katchen Locke, Ex. A, Deans Dep. 426:1-23, 427:16-428:22. Therefore, the only action taken by the Kennedy House that can be considered an "adverse action" as a matter of law is the termination of Deans's employment and health benefits.

In order to establish a prima facie case, Deans must therefore show that his employment and benefits were terminated under circumstances that give rise to an inference of discrimination. See Makky, 541 F.3d at 214. Deans attempts to do so by demonstrating that he was treated less favorably than two similarly situated employees outside of the protected class. Specifically, he says that employees Patrice McGinty and William Curran were treated more leniently for attendance problems than he was, and that McGinty was allowed to work an adjusted schedule without any difficulty. See Mem. Support Pl. Mot. Summ. J. 12-13; Pl.'s Resp. Kennedy House Statement Facts ¶¶ 15-17; Pl. Mot. Summ. J. ¶ 45. In other words, Deans alleges that he, McGinty, and Curran all had difficulty with punctuality and attendance, but that only he was regularly disciplined and eventually terminated.

Accepting for the sake of argument that McGinty and Curran were treated somewhat more leniently for their tardiness issues (something Defendants vehemently contest), those circumstances are insufficient to give rise to an inference that Deans's termination was motivated by discriminatory animus. In a nutshell, Deans's allegation is that the Kennedy House terminated his employment because his managers harbored a bias against black, male employees who did not conform to the Kennedy House's conception of the family roles such employees should

31

occupy. Therefore, in order to be an appropriate comparator, a nonblack and/or female employee must have occupied the same family role Deans identifies (that is, part-time childcare provider) and have been treated more favorably at work.

Neither of Deans's alleged comparators fits the bill. Nowhere in the record is there any indication that Curran's tardiness problems were related to childcare responsibilities (indeed, it is unclear whether Curran even has children). Thus, even if Curran and Deans were treated differently, that fact does not support an inference that Deans was fired because of his nonconformance with "traditional" family roles. As for McGinty, although there is evidence that she has children, there is no indication that childcare duties caused her to be late for work. Furthermore, while Deans suggests that McGinty's adjusted schedule was due to her childcare responsibilities, he admits that he was also granted an adjusted schedule for that reason. The only alleged difference in their treatment in that regard is that Deans encountered more difficulty obtaining and retaining his adjusted schedule. But McGinty was granted her adjusted schedule by the Kennedy House manager who preceded Giblin, and thus the ease with which she allegedly received her accommodation does not support an inference that Deans's difficulties with Giblin were due to discriminatory animus.

Moreover, the critical inquiry here is not whether the Kennedy House treated each employee identically, but instead is whether Deans's termination was the product of unlawful discrimination. Deans does not dispute that, immediately prior to the termination of his employment, he was absent from work for multiple days without contacting Giblin or other Kennedy House management. Thus, absent evidence that other employees engaged in similar conduct without facing similar consequences, the circumstances surrounding Deans's termination do not support an inference of discrimination. See Oakley v. Orthopaedic Assoc. of Allentown, Ltd., 742 F. Supp. 2d 601, 608 (E.D. Pa. 2010) (concluding that employees are "similarly situated" for purposes of establishing a prime facie case of employment discrimination "when their conduct on the job – or misconduct – is similar in nature"). Deans does not identify any other employee at the Kennedy House who was absent for multiple days yet retained employment despite failing to contact Kennedy House management. He therefore has not demonstrated that he was treated differently than similarly situated employees outside the protected class, nor has he presented other evidence that could establish the fourth element of his prima facie case.[16]

---

[16]     Although Deans focuses on the comments Giblin made that arguably reflect disdain for Deans's childcare responsibilities, those comments cannot – without more – support an inference of discrimination. At best, they show bias against

Because Deans has not satisfied the fourth element of his prima facie case, he cannot succeed on his gender and race discrimination claims against the Kennedy House.[17] Accordingly, the Court will grant the Kennedy House Defendants' motion for summary judgment as to Deans's claims of race and gender discrimination under Title VII, § 1981, and the PHRA.

### b. Claims Against the Union Defendants

Under Title VII, § 1981, and the PHRA, a union may also be liable for discrimination based on a protected characteristic. See Goodman v. Lukens Steel Co., 482 U.S. 656, 668-69 (1987) (concluding that a union's handling of grievances

---

Deans's parental status, which is not a protected characteristic under Title VII, § 1981, or the PHRA. For that reason, Deans must show that other employees with the same parental status, but outside of his protected classes, were treated differently (which, as discussed above, he has failed to do). Only then could he raise an inference that he suffered adverse actions not due to his parental status, but instead due his race and/or gender.

[17] Even if Deans had established a prima facie case, he could not succeed on his discrimination claims because he has not shown that the Kennedy House's proffered reason for his termination – his failure to report to work or provide sufficient medical documentation following his back injury – is a mere pretext for unlawful discrimination. Although he presents some evidence that his earlier disciplinary actions were perhaps based on inaccurate information, he presents no evidence "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Giblin's description of the events leading to his termination "that a reasonable factfinder could rationally find [it] 'unworthy of credence.'" Burton, 707 F.3d at 427 (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)).

violated Title VII); see also Martinez v. Int'l Bhd. of Elec. Workers-IBEW Local Union No. 98, 352 F. App'x 737, 740 (3d Cir. 2009) (not precedential) (concluding that, under Title VII and the PHRA, "a [u]nion is barred from discriminating against its members based on race, color, religion, sex, or national origin"). But, as with all such claims, a plaintiff must first file a charge with the EEOC or the PHRC before bringing a Title VII or PHRA claim against his union in federal court. See 42 U.S.C. § 2000e-5(e), (f)(1); 43 Pa. Cons. Stat. §§ 959(a), 960. Generally speaking, that charge must actually name the party against whom the Title VII or PHRA action is later brought. Schafer v. Bd. of Public Educ., 903 F.2d 243, 251 (3d Cir. 1990) (citing Glus v. G.C. Murphy Co., 629 F.2d 248, 251 (3d Cir. 1980)). Although there is an exception to that rule "when the unnamed party received notice and when there is a shared commonality of interest with the named party," id. at 252, courts have routinely held that a union and an employer do not share such an interest. See, e.g., id. (concluding that the union and the employer "do not share the commonality of interests and notice" necessary for the exception); Goodman v. Lukens Steel Co., 777 F.2d 113, 127-28 (3d Cir. 1985) (same); Gilmore v. Local 295, Int'l Bhd. Teamsters, 798 F. Supp. 1030, 1038 (S.D.N.Y. 1992) (dismissing a Title VII claim against plaintiff's union because the EEOC charge named only the

35

employer, and the union "does not have an identity of interest or an agency relationship" with the employer).

Although Deans filed two charges against the Kennedy House, he never filed a formal charge against the Union with either the EEOC or the PHRC. Indeed, the only action he took to send a letter to the EEOC after his termination complaining about the quality of the Union's representation and stating that he wanted to amend the previously filed charges "to reflect the union SEIU Local 32BJ supporting . . . the employer in the violation of my Title VII rights." EEOC Letter 8. The EEOC never treated his letter as a formal charge or amendment, and Deans cannot contend that he was unaware of the proper method for adding an allegation to a previous charge, as he successfully filed an amended charge in November 2010 adding allegations of retaliation and race discrimination to his original EEOC charge. EEOC Charge 1. Moreover, because Deans failed to file a charge against them, the Union Defendants were not formally notified and perhaps were even unaware of Deans's allegations until the filing of the complaint in the instant action.[18] The Union

---

[18]     At least some of the Union Defendants may have been aware of the EEOC charges against the Kennedy House, but Deans has presented no evidence that they knew that he was bringing similar charges against the Union as well.

Defendants therefore had no notice of the Title VII and the PHRA claims against them.[19]

Based upon that evidence, the Court finds that Deans did not exhaust his administrative remedies as required by Title VII and the PHRA. The Court therefore will grant the Union Defendants' motion for summary judgment as to Deans's Title VII and PHRA claims.[20]

That leaves 42 U.S.C. § 1981 as the only means by which Deans can bring his discrimination claims against the Union. A claim under § 1981 generally requires the same elements of proof as an employment discrimination claim under Title VII, but "is limited to issues of racial discrimination in the making and enforcing of contracts." Anjelino v. N.Y. Times Co., 200 F.3d 73, 98 (3d Cir. 1999); see also Anderson, 621 F.3d at 267; Brown

---

[19]    As for the "commonality of interest" component of the exception, Deans provides no facts upon which to support a conclusion that the Union and the Kennedy House share such an interest. See Schafer, 903 F.2d at 252 (describing the relevant facts).

[20]    Because he cannot sustain a discrimination claim against the Kennedy House or the Union, Deans also cannot succeed on his PHRA claims against individual defendants Johnson, Giblin, Smith, and McMillan. Although the PHRA permits claims against individuals for aiding or abetting an unlawful discriminatory practice, see 43 Pa. Stat. Ann. § 955(e), individual employees cannot be held liable if the employer is not liable for a discriminatory practice. See Scott v. Sunoco Logistics Partners, LP, 918 F. Supp. 2d 344, 357 n.5 (E.D. Pa. 2013) ("If the employer is not liable for any discriminatory practice then an individual employee cannot be held liable for aiding and abetting a discriminatory practice.").

v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001)
(requiring § 1981 claimants to establish "intent to discriminate
on the basis of race"). A union may be liable under § 1981 if it
"instigated or actively supported" an employer's discriminatory
actions, Anjelino, 200 F.3d at 95, or if it "otherwise . . .
discriminate[d]" against one of its members, Goodman, 482 U.S.
at 667, 669. See also Hubbell v. World Kitchen, LLC, 717 F.
Supp. 2d 494, 497-502 (W.D. Pa. 2010) (describing possible
discrimination claims against a union). A union's failure "to
challenge discriminatory discharges" or its "refusal to assert
racial discrimination as a ground for grievances" can constitute
such unlawful discrimination. Goodman, 482 U.S. at 664-65.

     Here, the Union cannot be liable for supporting the
employer's discriminatory actions because, as discussed above,
there is no evidence that the Kennedy House discriminated
against Deans. Therefore, in order to be liable under § 1981,
the Union must itself have taken an adverse action against Deans
on the basis of his race.

     As with his claims against the Kennedy House, Deans
identifies numerous actions taken (or not taken) by the Union
that he deems to be "adverse," including failing to file
grievances regarding the June and July disciplinary actions,
denying him a Step 1 meeting during the termination grievance
procedure, not investigating his allegations of workplace

discrimination, erroneously informing him that his grievance committee hearing was a "first step" hearing, and poorly representing him during his Step 3 hearing.[21] Mem. Support Pl. Mot. Summ. J. 14-18. Assuming _arguendo_ that such actions are sufficiently adverse to form the basis for a discrimination claim, Deans still cannot succeed on his § 1981 claim because he has presented no evidence that the Union took those actions for racially discriminatory reasons. See _Hubbell_, 717 F. Supp. 2d at 503 (concluding that plaintiff "cannot prevail in her claims against [her union] absent a showing that the grievance process was abandoned for _discriminatory_ reasons") (emphasis in original). Although Deans alleges that the Union pursued three other employees' grievances more aggressively than his, he has not introduced evidence of the facts underlying those employees' grievances. He has therefore failed to show that he was similarly situated to those employees, such that the Union should have handled their grievances in a similar fashion. A reasonable factfinder thus cannot find, under the circumstances, that the Union's handling of Deans's complaints and grievances

---

[21]     Deans does not challenge the Union's decision not to take his grievance to arbitration, which is the final step in the grievance procedure. Indeed, he pointedly states in his reply brief that he "has never alleged or raised claims that the Union should have taken his claims to arbitration." Pl.'s Reply Opp'n Defs.' Resp. 7, ECF No. 95.

was motivated by discriminatory animus, as is required under §
1981.

### 2. Hostile Work Environment

In addition to his race and gender discrimination claims,
Deans also brings hostile work environment claims against the
Kennedy House and the Union. Compl. ¶¶ 108-112. To succeed on
those claims, Deans must show that: (1) he suffered intentional
discrimination because of a protected characteristic; (2) the
discrimination was severe or pervasive; (3) it detrimentally
affected him; (4) it would have detrimentally affected a
reasonable person of the same protected class in his position;
and (5) there is a basis for vicarious liability. Mandel v. M &
Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).

In considering whether those elements are established,
courts must evaluate the record "as a whole," concentrating "not
on individual incidents, but on the overall scenario." Cardenas,
269 F.3d at 261 (quoting Durham Life Ins. Co. v. Evans, 166 F.3d
139, 149 (3d Cir. 1999)). Relevant circumstances may include
"the frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere
offensive utterance; and whether it unreasonably interferes with
an employee's work performance." Mandel, 706 F.3d at 168
(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).
Unless extremely serious, offhand comments and isolated

40

incidents are insufficient to sustain a hostile work environment claim. Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005).

In support of his hostile work environment claim against the Kennedy House, Deans cites Giblin's various comments regarding his childcare responsibilities, the disciplinary actions taken against him, the allegedly heightened scrutiny of his performance, and the events surrounding the termination of his employment. Notably, none of those actions is clearly discriminatory in nature. Deans admits to many of the tardiness and absence issues that formed the basis for the disciplinary actions, and he does not allege that his supervisors ever made overtly racist or sexist comments. Cf. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996) (identifying a hostile work environment based on evidence that, for eight years, defendant's employees "made inherently racist remarks" on a daily basis).

Nonetheless, assuming for the sake of argument that Deans could demonstrate some discriminatory intent on the part of the Kennedy House, he still cannot establish that the discrimination was "severe or pervasive" enough to support a hostile work environment claim. See Mandel, 706 F.3d at 168. Deans does not claim to have been harassed or bothered on a daily or even a weekly basis. At best, he has identified sporadic disciplinary

actions – separated in time by months – and occasional comments from Giblin and Johnson expressing disapproval of his childcare responsibilities. Such offhand comments and isolated incidents are not severe enough nor did they occur with such frequency for a reasonable jury to find that Deans was exposed to a hostile work environment. Accordingly, the Kennedy House is entitled to summary judgment on this claim.

For largely the same reason, Deans also cannot succeed on his hostile work environment claim against the Union. There is simply no evidence of "severe or pervasive" race-based discrimination on the part of the Union, id., and thus the Union Defendants are entitled to judgment as a matter of law on this claim.

### 3. Retaliation and Retaliatory Discharge

Deans also alleges that the Union and the Kennedy House retaliated against him for his EEOC charges, in violation of Title VII. See 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, "a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir.

1995)). An "adverse employment action" in this context is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68 (internal quotation marks omitted). If a plaintiff establishes a prima facie case of retaliation, the court continues to the subsequent steps in the McDonnell Douglas framework outlined above. Moore, 461 F.3d at 342.

Here, Deans's filing of his EEOC and PHRC charges clearly constitutes a "protected activity" for purposes of a retaliation claim. Therefore, in order to establish a prima facie case of retaliation, he must show that (1) his employer or the Union took an adverse action against him after he filed an EEOC charge; and (2) there is a causal connection between that action and the filing of the charges.

a. Claims Against the Kennedy House Defendants

Although Deans identifies numerous allegedly adverse actions the Kennedy House took against him, only a few of them occurred after he filed his first EEOC charge, namely: (1) the docking of his pay on September 7, 2010; (2) Giblin's alleged interference with his adjusted schedule in September 2010; and (3) the termination of his employment and health benefits in January 2011. Of those, only the termination is sufficient to have deterred a reasonable employee from complaining of

43

discriminatory conduct. As discussed above, Deans was docked only fifteen minutes of pay (and admits to the underlying conduct), and he was allowed to retain his adjusted work schedule. Perhaps more to the point, those actions clearly did not deter him from complaining of the alleged discrimination, as he filed the Second EEOC Charge in November 2010. See supra p. 10.

The Court must therefore consider whether the evidence, viewed in the light most favorable to Deans, shows a causal connection between Deans's termination and his EEOC charges. Although the causation analysis is highly fact-based, and depends on the particular context in which the events occurred, a plaintiff can generally "adduce causation of retaliation through evidence that illustrates 'close temporal proximity' and circumstances indicating a 'pattern of antagonism' following the protected conduct." Allen v. Nutrisystem, Inc., No. 11-4107, 2013 WL 1776440, at *5 (E.D. Pa. April 25, 2013) (Robreno, J.) (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 302, 306 (3d Cir. 2007)); see also Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000). Unless it is "unduly suggestive," temporal proximity is generally insufficient by itself to support a finding of causation. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012).

Based upon that standard, Deans has failed to adduce sufficient evidence for a reasonable jury to find a causal relationship between his EEOC filings and his termination. First of all, the temporal proximity between his EEOC filing and the termination of his employment is not "unduly suggestive." Approximately five months elapsed between those two events, which is a far cry from the time frames the Third Circuit has considered to be particularly suggestive of a causal connection. See, e.g., id. (finding seven days unduly suggestive); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (two days); see also Farrell, 206 F.3d at 278-79 (declining to decide whether a three to four week period between the two events would be sufficient – by itself – to support an inference of causation).

Deans must therefore demonstrate other circumstances in conjunction with that timing, such as a pattern of antagonism, in order to establish the third element of his prima facie case. But the only two potentially harassing or "antagonistic" episodes he identifies that occurred after his EEOC filing are the docking of his pay for minor tardiness issues and the formalization of his adjusted time schedule, both of which took place in September 2010. Those two incidents, separated in time from his termination by almost four months, do not constitute the types of "continuous and extreme antagonistic treatment" necessary to support an inference of causation. Allen, No. 11-

45

4107, 2013 WL 1776440, at *6 (citing Marra, 497 F.3d at 306;

Robinson v. Se. Pa. Trans. Auth., 982 F.2d 892, 895 (3d Cir.

1993)).

Accordingly, as Deans cannot establish a necessary
element of his prima facie case, he cannot succeed on his
retaliation claims, and the Kennedy House Defendants are
entitled to judgment as a matter of law.

### b. Claims Against the Union Defendants[22]

With regard to the retaliation claims against the Union,
the alleged adverse action seems to be the allegedly subpar
representation of Deans during the termination grievance
procedure, in particular the Union's failure to hold a Step 1
meeting, its inaccurate portrayal of the Step 3 hearing as a
"first step" hearing, and its inadequate representation at the
Step 3 hearing.[23] Assuming for the sake of argument that the
Union's representation of Deans was poor enough to constitute an
"adverse action," Deans has presented no evidence of a causal

---

[22]       Although the complaint seems to ground Deans's
retaliation and retaliatory discharge claims solely in Title
VII, a plaintiff can also bring a retaliation claim under §
1981. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 446 (2008).
Therefore, construing Deans's complaint generously, the Court
does not treat his retaliation claim as barred by his failure to
exhaust his administrative remedies under Title VII.

[23]       As discussed above, see supra note 21, Deans does not
challenge the Union's decision not to take his grievance to
arbitration.

connection between that representation and his EEOC filing.
Indeed, the only hint of a connection that Deans points to is an
alleged conversation in the fall of 2010 between him and
McMillan (the Union Shop Steward), in which McMillan asked Deans
how he could have an EEOC charge against the Kennedy House and
still be employed there and suggested that the charge might hurt
the Union during future negotiations with the Kennedy House. No
reasonable jury could conclude based solely on those comments
that the Union deliberately sabotaged (or at least neglected)
Deans's representation during his grievance procedure in
retaliation for his filing of an EEOC charge against the Kennedy
House. The Court therefore concludes that Defendants are
entitled to judgment as to Deans's retaliation and retaliatory
discharge claims.

### 4. Hybrid § 301/Fair Representation Claim

In addition to his discrimination and retaliation claims,
Deans also alleges that the Kennedy House repeatedly violated
the terms of the CBA, and that the Union breached its duty of
fair representation by refusing to process "first step"
grievances on several occasions and by poorly processing the
termination grievance. Compl. ¶¶ 131-147. To recover on those
allegations, Deans must establish the elements of a "hybrid §
301/fair representation" claim. DelCostello v. Int'l Bhd. of
Teamsters, 462 U.S. 151, 164 (1983). Such a claim "comprises two

causes of action": a suit against the employer for breach of a collective bargaining agreement under § 301 of the LMRA, and a suit against the union "for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act." Id. Those two actions are interdependent. A plaintiff can only recover for an employer's breach of the collective bargaining agreement if he can show that, because of his union's unfair representation, he should not be bound by the result of the CBA's grievance procedure. Id. at 163-64. Likewise, a union's breach of that duty is actionable only if the employer did in fact breach the terms of the CBA. Id. at 164. Thus, whether an aggrieved employee sues his employer, his union, or both, "he must prove the same two facts to recover money damages: that the employer's action violated the terms of the collective-bargaining agreement and that the union breached its duty of fair representation." Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 564 (1990).

A hybrid § 301/fair representation claim is subject to a six-month statute of limitations period. Podobnik v. U.S. Postal Serv., 409 F.3d 584, 593 (3d Cir. 2005) (citing DelCostello, 462 U.S. at 172). That period "begins to run when 'the plaintiff receives notice that the union will proceed no further with the grievance.'" Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d

Cir. 1986) (quoting <u>Bruch v. United Steelworkers of Am.</u>, 583 F. Supp. 668, 670 (E.D. Pa. 1984)).

At the motion to dismiss stage, the Court held that Deans could pursue his hybrid § 301/fair representation claim only to the extent that it relates to grievances that were the subject of the Step 3 grievance hearing held on April 13, 2011, as all other complaints were barred by the statute of limitations. The Union Defendants now argue that the six-month statute of limitations bars Deans's claim entirely. They say that the April 13 hearing addressed only Deans's termination grievance, that Deans learned that his termination had been upheld on May 2, 2011, and that he did not file his complaint until November 15, 2011, slightly more than six months later. Union Def. Mot. Summ. J. 5-7. Deans acknowledges that he received a call from his union representative on May 2 regarding the committee's decision, but he says that he did not know the decision was actually final until he received a written record of the decision on May 15. Based on that version of events, Deans narrowly made the six-month filing deadline.

Viewing the facts in the light most favorable to Deans, the Court concludes that his hybrid § 301/fair representation claim is not time-barred. Although Deans received some information regarding the status of his grievance on May 2, a reasonable juror could find that the telephone call from a Union

official did not provide sufficient "notice that the union [would] proceed no further with the grievance." See Hersh, 789 F.2d at 232. Therefore, as Deans filed his complaint within six months of receiving the committee's decision in writing, the Court will consider the merits of his claim.

Both the Kennedy House and the Union contend that Deans has established neither required element of a hybrid § 301/fair representation claim. More precisely, they say that the Kennedy House did not breach the terms of the CBA and that the Union did not breach its duty of fair representation during its handling of Deans's termination grievance.

But, even assuming arguendo that the Kennedy House did breach the CBA, Deans still cannot succeed on his hybrid § 301/fair representation claim because there is no evidence that the Union breached its duty of fair representation.[24] A union may breach its duty of fair representation if its actions are "arbitrary, discriminatory, or in bad faith." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991) (quoting Vaca v. Sipes, 386 U.S. 171, 190 (1967)). "[A] union's actions are

---

[24]     Because the Court finds that Deans cannot demonstrate that the Union breached its duty of fair representation, the Court need not consider whether the Kennedy House's termination of his employment was in violation of the CBA. See United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 62 (1981) (explaining that, "[t]o prevail against either the [employer] or the Union," a plaintiff must "carry the burden of demonstrating breach of duty by the Union").

arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." Id. (citation omitted).

When considering whether a union's actions fall within that range, courts "must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." Id. at 78. That standard "gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong," and even if its errors in judgment may rise to the level of negligence. Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 45-46 (1998); see also United Steelworkers of Am. v. Rawson, 495 U.S. 362, 372-73 (1990) ("[M]ere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation."). Furthermore, when reviewing representation at a grievance hearing, courts must give "due regard for the fact that both the advocates and the tribunal members are laymen," not lawyers. Findley v. Jones Motor Freight, 639 F.2d 953, 961 (3d Cir. 1981). "If the [grievance] panel had the essential facts before it, a decision adverse to the employee does not establish a breach of the duty of fair representation, even if a court would

have come to a different conclusion in passing on the merits of the grievance." Id.

Deans contends that his union representatives breached their duty of fair representation regarding his termination grievance by: (1) failing to hold a Step 1 grievance meeting; (2) providing only twenty hours' notice of his Step 2 meeting; (3) referring to his Step 3 grievance hearing as a "first step" hearing; (4) poorly representing Deans during the Step 2 meeting and the Step 3 grievance hearing; and (5) declining to argue to the grievance committee that his termination was the product of unlawful discrimination. Compl. ¶¶ 138-147. He admits, however, that he had plenty of advance notice of the Step 3 grievance hearing, that he had an opportunity to present arguments at the Step 2 meeting and at the Step 3 grievance hearing, that Smith and McMillan were present for both steps in the process, and that the grievance committee had before it copies of the letters, text messages, and medical documentation relevant to his termination. In other words, he acknowledges that the Union processed the grievance through the second and third steps in the grievance procedure, that he argued the merits of his case to the grievance committee, and that the relevant documentary evidence was before the committee. He therefore effectively concedes that the grievance committee "had the essential facts

before it" when it made its decision. See Findley, 639 F.2d at 961.

As for the failure to hold a Step 1 meeting, the Union provides a valid justification: Step 1 meetings, which are informal conversations among the Union Shop Steward, the employee, and the employee's supervisor, in practice are held only when they "would be helpful in resolving the matter," and are generally not held "if a worker is not at the work site at the time of termination." Union Statement Facts ¶ 38. This step is essentially a conciliatory one, and not one at which decisions concerning the merits of the grievance are made. Although Deans has presented some evidence that another employee was given a Step 1 meeting despite possibly being absent from work when terminated (Mem. Support Pl. Mot. Summ. J. 16), that fact does not rebut the Union's claim that the standard for determining whether to hold a Step 1 meeting is whether such a meeting would be helpful. It is certainly within the Union's discretion to call for a Step 1 meeting, and to determine that a Step 1 meeting would not be helpful in Deans's case. Thus, the Union's failure to hold a Step 1 meeting does not place its actions outside the range of reasonableness. See Air Line Pilots, 499 U.S. at 67.

Given the deferential standard used in assessing the reasonableness of a union's actions, Deans has not presented

sufficient evidence for a reasonable factfinder to conclude that the Union breached its duty of fair representation in the handling of his grievance. Accordingly, Deans's hybrid § 301/fair representation claim cannot succeed against either the Union or the Kennedy House, and Defendants' motions for summary judgment will be granted as to that claim.

### 5. ERISA Claim

Finally, Deans alleges that the Kennedy House's process for terminating his health benefits and informing him of his right to continuation coverage violated ERISA. His primary contention is that his health benefits were terminated on January 22, 2011, while he was still employed at the Kennedy House, and that he received improper or untimely notice of his right to continuation coverage under COBRA.[25] Compl. ¶ 166; Mem. Support Pl. Mot. Summ. J. 24.

Pursuant to COBRA's amendments to ERISA, employees whose employment has been terminated must, in certain circumstances, be informed of their right to elect continuation of their health benefits. Williams v. New Castle Cnty., 970 F.2d 1260, 1264 (3d Cir. 1992) (citing 29 U.S.C. §§ 1161-68)). More precisely, an employee who has a right to continuation coverage under COBRA

---

[25] He also suggests in his motion for summary judgment that he was discharged for the purpose of interfering with his rights under ERISA (Mem. Support Pl. Mot. Summ. J. 24-25), but he has presented no evidence in support of that contention.

must be informed of his right to elect such coverage within
fourteen days of the date on which the plan administrator is
notified that a "qualifying event" has occurred. 29 U.S.C. §
1166(c). COBRA's definition of a "qualifying event" includes
"[t]he termination (other than by reason of such employee's
gross misconduct), or reduction of hours, of the covered
employee's employment." Id. § 1163(2). A covered employee must
therefore be informed of his right to elect continuation
coverage within fourteen days of when the plan administrator
learns of the termination of his employment.

Here, the undisputed evidence shows that Deans was sent a
COBRA notice on February 24, 2011, precisely fourteen days after
Giblin sent the letter informing him that he had been deemed to
have abandoned his position. See Letter re: Aetna Insurance.
That notice explained that he would no longer be covered by his
current employer health plan as of February 28, 2011, but he
could continue his benefits by electing COBRA coverage. Id.
Deans has not provided any contradictory evidence regarding his
Aetna health benefits, nor does he contend that the substance of
that notice violates COBRA or ERISA in any way. Accordingly,
there is no evidence upon which a reasonable juror could find
that the Kennedy House failed to comply with COBRA in
terminating Deans's Aetna health coverage.

As for Deans's claim that his benefits were actually terminated on January 22, 2013, the evidence he submitted in support of that allegation relates only to the termination of his dental benefits. Although dental benefits can be covered by ERISA and be subject to COBRA requirements, Deans has presented no evidence regarding the COBRA notice (or absence thereof) that he received with regard to those benefits. Indeed, Deans has not submitted evidence as to what dental coverage he was entitled to, and what the Kennedy House did to inform him about the termination of his coverage and his right to continue it. Therefore, on this record, it is impossible for the Court to conclude that the Kennedy House's actions violated ERISA. The Court therefore will enter judgment in favor of the Kennedy House on this claim.

B. <u>Plaintiff's Motion for Summary Judgment</u>

Because Deans has not presented evidence upon which a reasonable factfinder could find in his favor on any of his claims, the Court concludes that he is not entitled to judgment as a matter of law, and his motion for summary judgment must be denied.

## V.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motions for summary judgment in their entirety, deny Plaintiff's motion for summary judgment, and enter judgment in

favor of all Defendants and against Plaintiff. An appropriate

order follows.